CHARLOTTE BIDWELL, individually, and as executrix of Henry C. Bidwell, deceased, et al.,

*v.*

ELIZA A. PIERCY.

[Argued April 23d and 24th, 1905.   Decided March 5th, 1906.]

1. Where a wife died seized of certain city lots, leaving her surviving her husband and four children, after which the husband leased the lots to another, such lease terminated by operation of law on the husband's death, the children not having joined therein.

2. Where a grantor conveyed certain land for an inadequate consideration to the wife of his intimate friend, to whom he had rented the property, for the alleged purpose of freeing his mind from the burden of his supposed obligation to pay taxes on the tenant's improvements, and the grantee had knowledge at the time that the grantor was an old man and had suffered a severe stroke of apoplexy, the burden was on such grantee to establish that the grantor had capacity to execute the deed.

3. In a suit to set aside an improvident deed executed by a grantor when he was sixty years of age, and after he had been compelled to give up business because of a stroke of apoplexy, evidence *held* sufficient to establish that he had not sufficient capacity to execute the same.

4. Where a grantee, holding under a deed executed by a grantor without sufficient mental capacity, had not changed her position to her prejudice because of the deed, nor spent any money in improving the property, which he would not have spent under a lease thereof that was held by her husband at the time the deed was made, the grantor's distributees were not estopped to recover the land on placing the grantee in *statu quo.*

---

Final hearing on bill, answer and proofs.

*Mr. Robert L. Lawrence,* for the complainants.

*Mr. L. Edward Hermann, Jr.,* for the defendant.

PITNEY, V. C. (orally).

I do not care to hear you, Mr. Lawrence.

The suit is brought by the widow and four children, as devisees of Henry C. Bidwell, to set aside a conveyance made by him on the 29th of January, 1903, to the defendant, Mrs. Piercy, of a lot of land in the city of Jersey City for the consideration of $200.

The bill has a double aspect.

In the first place, it alleges that the whole conveyance should be set aside because the deceased, at the time he made it, was not in a state of mind and did not have the proper surroundings to enable him to make the contract.

And, second, that he did not understand that he was conveying all the land described by the deed, and that if it be sustained, it should be sustained only for a portion of the land.

This last claim is irrespective of the degree of his mental capacity, and the complainants support the claim of mistake by a reading of the deed itself.

I will consider both of these matters together, but after stating the facts and history, I will pay attention to the description in the deed first.

Mr. Bidwell was a gentleman about sixty years old, a married man, living with his second wife. He had four adult children by his first wife, a son and three daughters, and an infant child by his second wife. His father had died many years previously, leaving a pretty large family of children and considerable real estate in the neighborhood where Mr. Bidwell lived, and that real estate had been plotted after the death of the elder Bidwell into building lots by Fowler & Van Kuerin, a firm of surveyors, and there had been a partition between the heirs, carried out by conveyances.

Afterwards a street had been moved, which made it necessary to readjust the division to make it adapt itself to the change of the street, and the result was a new series of conveyances, made in 1895, I believe, which will account for a curious state of things to which I will refer directly.

Then one or two maps of the street and lots as readjusted were prepared for the purpose of an auction, to be held on the 23d of May, 1900, by Mr. Wolbert, a well-known auctioneer in Jersey City. Those maps were made and printed on paper, no doubt in great numbers, and are produced here, and when you look at them you can see that they were intended to be spread around among people to attract purchasers, and no doubt were extensively distributed.

The part of the property with which we are now dealing was near the corner of Jackson avenue and Bidwell avenue.

Mr. Henry Bidwell, the grantor herein, lived in a house built on lot No. 58, which fronted on Jackson avenue, and was separated by one lot, No. 57, from Bidwell avenue, which was the corner lot.

Then on the other side of 58 were two others, 59 and 60, the four lots, taken together, making pretty nearly a square, fronting on Jackson avenue, and were all used and occupied, as I understand it, in connection with the dwelling-house.

But the title to the two lots, 57 and 58, immediately connected with the dwelling had been in his first wife, and at her death descended to her four children, the complainants herein, subject, however, to his life right.

The title of lots 59 and 60 was in Mr. Bidwell; also the lot in the rear of the four lots, 57, 58, 59, 60, which fronted on Bidwell avenue, numbered 137, and is known in common language as a butt lot.

That lot was nearly forty-two feet front and one hundred and twelve feet deep. It had a peculiar shape. That depth—one hundred and twelve feet—was greater than the combined width of the four lots Nos. 57, 58, 59 and 60, so that the butt lot extended further into the body of the block by twenty-one feet and some inches than the other four, and also had a little jog on the side of it a few feet in width, making it forty-four feet and forty-five hundredths inches in width at the rear and forty-one and eighty-six hundredths in front. (See map annexed.)

Portion of the Lithographed Map of Building Lots at Jersey City Heights, belonging to the Estate of A. G. Bidwell, deceased.

Now, on lot 137 and on the lot adjoining, 136, which belonged to Dr. Bidwell, a brother of Henry, was a dwelling, a shallow, long dwelling, which stood partly on both lots, and on No. 137 was a set of greenhouses, which encroached, as I understand the evidence, ten feet on the rear of the four lots, 57, 58, 59 and 60, which I have mentioned, and which fronted on Jackson avenue.

The greenhouses extended nearly to the rear of the lot, and were occupied, and had been for many years, by Mr. Piercy, husband of the defendant, and Mr. Henry C. Bidwell was entitled to the rent of all that part which belonged to his first wife, and after her death to her four children, as tenant by curtesy.

But by arrangement of all parties, the details of which are not given here, but is admitted on all hands, Mr. Piercy had the right of removal. He had a well nigh permanent lease. The length of his lease I do not know. I asked for it, but it was not given, and it is of no consequence. It may be in existence yet for what I know. But he had a lease which enabled him to remove his greenhouses and dwelling, whatever it was, on lot 137, at the end of the lease. Necessarily he would be obliged to remove it, so far as lots 57 and 58 were concerned, at the death of Henry C. Bidwell, because the title of his children would then intervene, and unless they joined in the lease, that would end it.

Now, I state this all so minutely because I wish it well understood. I wish to see if I have made any mistake, though it may not be of much consequence. Now, that was the situation.

Mr. Piercy and Mr. Bidwell were intimate friends; it is so stated in the answer, and it so appears. Mr. Bidwell and Mr. Piercy were on confidential terms; I think that is the language in the answer.

In that state of things Mr. Bidwell, in the month of August, 1902, had a very severe stroke of apoplexy, so that he was unconscious for some time—I forget how many days, but absolutely unconscious for a considerable time. Now, that involves a serious lesion or wound of the brain; it is the bursting of a blood vessel on the brain, and that is a serious matter. The extent of its seriousness depends on two or three things—*first,* the amount of vitality and strength in the tissue of the brain and

in the general condition of the man's or woman's health; and *second,* on the extent of the rupture.

There is as much difference in the injury to the brain from a stroke of apoplexy, varying with the extent of the rupture, as there is between the prick of a needle and the slash of a butcher knife on the external organs. It may be very slight, it may be very severe, and according to its severity is its effect upon the brain, which is the organ of the mind and thought. And it is common knowledge that a stroke of apoplexy affects a person's mind, because the brain is the seat of the mind and it affects the brain.

Now, without going into the extent of that injury at this time, the result was that he stopped business, substantially. He had been pursuing some business in New York, but after he got a little better—after the first effects of the apoplexy were over, and his physical disability was considerably relieved, so that his inability to use his left hand and left leg were so far improved that he could walk with assistance—he did go occasionally to his business in New York and stay for a little while, until it was sold out. But, substantially, he was a confirmed invalid from that time until he died. And the doctor says other serious symptoms appeared—softening of the brain and Bright's disease of the kidneys, and all those things. He was able to be about, but was an invalid.

Now, I am not going into the extent of the mental impairment any more than that—that he was disabled from doing any steady business, and certainly his mind was affected to a serious extent. We all know that the effect of softening of the brain is to weaken the mind, and the intervention of Bright's disease has the same tendency.

Then, when he was lounging around home, particularly in the next winter, he spent a great deal of the time in the greenhouses, where there is artificial heat—and we all know what that would be for a weak gentleman—and plenty of light, and there he had the benefit of the society of his friend, Mr. Piercy, and to a most confidential extent, as Mr. Piercy swears and as he states in his answer.

Now, this bare vacant lot was rented at $36 a year. But the greenhouses, of course, were of a great deal more value than that, and everybody knew it.

But it appears that the tax bills for the greenhouses were at one time made out against Mr. Bidwell, instead of against Mr. Piercy, or Mrs. Piercy, and that worried Mr. Bidwell. It ought not to have worried him at all. If he had been in full health and of sound mind it would not have disturbed him. He was just in that condition—crying about the least thing, and worried about the least thing—that it did worry him.

The result was, according to Mrs. Bidwell's testimony, that he told her he was going to sell that lot, on which the greenhouses were, to Mr. Piercy, for the amount of the appraised valuation for the purposes of taxation—$200. It does not appear that anyone of his children knew that he was about to do it. His son swears that he did not know anything about it, and his daughter, who was living at home, swears to the same thing. His other two daughters were living in Washington City and could not have any knowledge of it. And it did not appear, from Mr. Piercy's evidence, that he (Piercy) consulted with a single member of the family. He was questioned on that subject, and he never thought it worth while to say to the son, or to his wife or to any of the children, "I am going to buy this property of your father." Now, that is the posture of the affair. The bargain was made between Mr. Piercy and Mr. Bidwell in his greenhouses, as he was lounging there from day to day.

Well, the wife did not object. So much is against her. Whether she knew what the real value of the property was or not I do not know; but Dr. Bidwell swears it was worth at least $600, and judging from the rent it brought ($36 a year) it ought to be worth a great deal more than $200. But Mrs. Bidwell says that in order to quiet her husband's mind she was willing to join in the deed for the property upon which the building stood —whether she knew it was ten feet of it on other land or not does not appear—but she said it was lot 137 that she understood was to be sold, and these maps were lying about as thick as leaves in Vallambrosa, I suppose, and she knew what lot 137

was. And she understood it was to be lot 137, and says her husband understood it was to be lot 137.

So, according to the summing up of counsel—I did not so quite understand the evidence, but I take his statement of it, and it so appears by the answer—Mr. Piercy and Mr. Bidwell went to a scrivener to have a deed drawn. They went together. None of Mr. Bidwell's friends were with him. A man of weakened mind goes with his confidential friend to have a deed prepared from him to his confidential friend, with no one at his elbow to look after his rights. That was the situation—confessedly the situation.

They went to a Mr. Mumford to have the deed prepared. Now, it would have been very satisfactory to the court if Mr. Mumford had been called here as a witness, and counsel for defendant, in his very able and ingenious argument, felt that at once, and he said it was the duty of the complainant to bring Mr. Mumford here, and not the duty of the defendant. I disagree with him. Under the circumstances of this case, which I have already stated, the burden is on Mr. Piercy, or on Mrs. Piercy, to show that Mr. Bidwell understood that contract. That burden arises out of two or three circumstances.

First, that he was palpably an invalid, unable to attend to his business, lounging around day in and day out and amusing himself in Piercy's greenhouses. Mr. Piercy knew that he had suffered a stroke of apoplexy, and he is chargeable with knowledge—I must hold every man of intelligence chargeable with knowledge—of the fact that a man who has had a stroke of apoplexy is more or less affected in his mind. There is no question about that.

In the second place, by the answer, he was on terms of confidential relations with Piercy, and, in my judgment, it matters not whether it be a lawyer or a trustee or a mere agent, when one man is on confidential terms with another, and a transaction takes place between them that is questionable, the burden is on the man that occupies the confidential relation and has had the benefit of the contract to sustain it. The burden may be greater or less. You cannot draw an exact line. But the burden was on Mr. Piercy.

In the third place, when you come to examine the paper itself, the burden is very strongly on Piercy to explain it.

Now I come to the deed, and it is very evident that Mr. Piercy either took one of these maps with him, and I take it he took the larger one, which shows this jog that I tried to speak of awhile ago on lot 137, or that Mumford had one already, and he also took the deed from Evarts to Bidwell of March 20th, 1895, which covered lot 137. That both the map and the deed were before the scrivener is beyond all peradventure. Now, that deed from Evarts to Bidwell is one of those given to readjust the partition after the change in the location of the street, which I have previously mentioned, and it is peculiar. It conveys lot 137 and parts of lots 59 and 60, viz., seventy-eight feet of the rear of those lots, which are one hundred and three feet deep, leaving only twenty-five feet of them in depth from the front not covered thereby, and the description is by courses and distances. But the description does not show on any map. With this material the scrivener prepared the deed apparently in his own handwriting. The description is very minute, and he copied the whole of it from the deed from Evarts to Bidwell. I believe they compare exactly, except that Mr. Mumford, in drawing the deed in question, omitted the points of the compass of the last course, which is of no consequence. And he refers to it, and he commences this way: "All those certain lots," in the plural, "all those certain lots, pieces or parcel of land," &c., "known and designated as lot 137 and parts of lots 59 and 60 in block No. 13 and 119 as laid down on a certain map filed July 5th, 1894. Map of the property belonging to the estate of A. G. Bidwell, deceased, situate in Jersey City, N. J., April, 1888, by Fowler & Van Kuerin, surveyors," &c., and "taken together described as follows," that is, the lot 137 and the parts of lots 59 and 60 taken together described as follows."—Now I believe that I am right in saying that that is just the way this reads—yes, precisely the same, taken exactly from the Evarts deed. It goes on and describes the lots by metes and bounds, and includes not only 137, but parts of lots 59 and 60, and the lots as described are shown by a diagram produced here by the defendant, and

shown on the map hereto annexed, but not on any other map. So that, besides including lot 137, it includes about three-fourths, a little more than three-fourths, of the rear of lots 59 and 60.

I will not stop here to say what the effect of such a bargain as that was, but I will stop to say that the reason why the deed from Evarts to Bidwell included the rear of lots 59 and 60 was explained on the stand by Dr. Bidwell, a brother of Henry Bidwell, to be that the necessity for it arose out of the readjustment of the streets. I will not go into it in detail, because it is of no consequence. But the remarkable thing is that it did include more than three-fourths of the rear of lots 59 and 60. Now the effect of that was to convey not only lot 137, but to destroy the value of lots 59 and 60, because it only left a few feet front of them, and it was the same thing almost as selling not only 137, but the whole of 59 and 60. I shall have a word to say about that later.

Now after getting through with that description, precisely copying it word for word from the Evarts deed, Mr. Mumford continues: "Being the same lot," not lots, but "the same lot." If it had been in the plural it would have been a different thing. "The same lot shown on a map of lots to be sold at public auction by F. S. Wolbert, auctioneer, on Wednesday, May 31st, 1900, as per plan hereto annexed."

Now there is a plan annexed to that deed, and it was made undoubtedly, according to the handwriting, by Mr. Mumford, and he must have had before him a map when he made it, because it is not made to a scale, and there are no courses or distances or numbers on those four lots facing Jackson avenue, but the lot 137 is put down on the map with substantial accuracy, and the distances of each one of the five sides are given with great care, precisely as they are given on this large map—Wolbert's map I will call it.

Now that is a remarkable circumstance. No explanation was made by Mr. Piercy of that. He even went so far as to swear that he did not know whether that little slip was annexed to the deed when it was executed or not—I understood him to say—I

do not want to do him any injustice. Who put it there? The deed was delivered to Piercy. It has been in his possession ever since, until produced here in court by the defendant, and never seen, so far as appears, except on one occasion when what is called a mistake was discovered after Mr. Bidwell's death, and it was then shown to these ladies. The map was evidently made by Mr. Mumford, as clearly appears by the circumstance that a little space is provided for the map—a space left in the body of the manuscript—where it is pasted on, and it was made for a purpose.

Now, why did Mr. Mumford make that, and what did he mean by inserting here, I repeat, "being the same lot shown on map of lots to be sold at public auction by F. S. Wolbert, as per plan hereto annexed." What lot of the five shown on that little map does he refer to? There can be but one answer. It was not one of those little ones facing on Jackson avenue, because the description calls for Bidwell avenue alone as having any facing on it. The description fixes the beginning point at the same distance from Bidwell avenue that this little plot shows, and thence follows the bounds of lot 137, and the only difference is that the description as he wrote it in took in the rear of these lots on Jackson avenue, which the little plot does not.

Now, it seems to me that the fair inference from all that is that Mumford is not a conveyancer in the sense that he knew how to plot lots, and no man is fit to convey—draw a deed—that does not know how to plot. Now, the poor man, in my judgment—and this is my inference—was called upon to prepare a conveyance of lot 137 and was given the Evarts deed; he read that description in it of a run of seventy-eight feet out of a hundred, I believe it is, out towards Jackson avenue, and then up the width and back again seventy-eight feet, and he did not know how to make a description of lot 137. He was not sufficiently versed in mathematics, in surveying, in plotting, for that purpose, so he copied the whole description from the Evarts deed and made and affixed a copy of lot 137, and pasted it on to know which was intended. Now, he was not here, but I will venture to say that if he is asked he will say that is just the way it happened.

Now, then, that description does not say "lot 137" in so many words, but it says that very thing in effect by making a plot of it a part of the description and referring to the map.

Now, it is not necessary for me to determine the question, so learnedly and ably argued by counsel for defendant, whether if that stood alone, and we have to determine here to-day which of those discordant descriptions should prevail in an action of eject-ment, for instance, at law. That is not the case here to-day. The question is, under the circumstances, which of those two discordant descriptions is to prevail; which one was what the parties meant; which one did Mr. Bidwell think he was making? And is it not perfectly fair to infer that he took this deed and this map which I have here before me, pointed out lot 137 to Mumford, and said, "That is the lot I want to convey; that is the lot that Mr. Piercy's wife's greenhouses are on, and here is my deed for it; this Evarts deed covers it; now you make up the description." And Mr. Mumford undertook a task that he was not equal to, and not being able to make a new description from the map, he says:

"I will make it plain; here is the lot that Mr. Bidwell has pointed out and that Mr Piercy has agreed to. I will make a little map of that lot and I will paste that on, and that will show what it was."

Now, that is the inference, after my experience of about fifty years or more in this kind of thing, that I put upon the trans-action, and that the real intention of the parties was to convey the small lot. That was what the only witness beside Mr. Piercy says she understood it was to be.

I will refer here to Mr. Vere. Mr. Vere, the acknowledging officer, who was sworn here yesterday, prided himself, and I am glad to believe that he was entitled to pride himself, on being particular in such matters, and I asked him, "Now, Mr. Vere, if you had seen that map there, of course you would have shown that to Mrs. Bidwell." But he also said she had read it over. Well, she could not read it over without seeing that map there, and she said she understood that lot shown on the map was what they were conveying, and if she had read the description in that

deed she would have been just as much at loss as Mr. Mumford was, and I am not quite sure Mr. Bidwell would not be at the same loss as Mr. Mumford; but Mr. Vere could point out on the map, and could see what they wanted to convey, and she could see that little map, and Mr. Vere could see it and say, "That is what you are going to convey; there is a map of it."

Now, Mr. Piercy swore there was a particular bargain between them. He swore to it and I will refer to that now.

Mr. Piercy swore that the bargain was that he was to have all the rear of those lots 59 and 60 because there was a well on them, and that he got his water from the well there; that the water had been cut off by the city. What did Mrs. Bidwell say about that? Why, that everybody in the neighborhood ran there to that well—it was an unfenced lot, and it would be very discourteous and unneighborly to prevent them, as long as they did not do any harm. And Piercy says, further—if there was any one thing more than another that affected my mind toward the conclusion of the whole thing, it comes right in there— that Mr. Bidwell told him:

"Now, I want you to have this land; $200 is what it is assessed at; you have been very good and paid it all in $36 a year, and you have paid for it all in rent, and you have been very good, and I want you to have the rear of these lots facing on Jackson avenue, because there is a well on them which you need; I want you to have the well; you have been a very good neighbor and I want you to have the well."

That is what Piercy swears to. Take it as true, there was never any better evidence produced in a court of justice to show that Mr. Bidwell did not know what he was about. No man of any judgment, no man who still retained his faculty, which I tried to describe to you awhile ago—"clearly to discern and discreetly to judge"—would ever have made any such bargain. The bargain on its face condemns itself.

Now, Dr. Bidwell swears, and he is not contradicted, that a fair value of that forty-two-foot front lot (137) is $600. It rented for $36 a year, including the ten feet belonging to the other lot, and, taking that off, about $28 a year. It was appraised by the assessor at $200—probably an old appraisement.

that has been standing there for years and years—and it was appraised and taxed, with the greenhouses put in, and collected from somebody. I suppose that Mr. Piercy paid it; I hope he did. Then we have these two lots on Jackson avenue. The question of what their value was was not asked, but it appears that Jackson avenue is an older avenue, probably, than Bidwell, and we observe that the lots near the corner are made to face on Jackson avenue rather than Bidwell. Here are two lots, twenty feet front each, actually ruined and to no advantage to anybody. Mr. Piercy or his wife could not use them except to put a greenhouse on, without getting the consent of the owner on the street front, and the owner of the front could not do anything with them without getting the rear. To sell them in that way is a thing that no man in his senses would ever do; and when Mr. Piercy swore deliberately that the bargain between him and Mr. Bidwell was that he should have the rear of those lots, if what he swore to was true, he presented the strongest reason why the court ought to set the whole thing aside. No doubt Mr. Bidwell might have said—without meaning to say that I don't believe Mr. Piercy—you have got the benefit of the well; you can run there to the well until the lots are sold—spoke of it in that way because he had had that advantage for all these years.

And now I come to another piece of evidence, and it is this: That every one of the complainants who have been sworn swear they never heard of this conveyance of the rear of lots 59 and 60 until the young ladies, after their father's death, came on from Washington and wished to ascertain what they owned, and they went to searching the records, and they find that deed, with the other plot, recorded; but when they come to read the deed over they find it covered more, viz., the rear of 59 and 60, and they went to the tax office for information, and when they got to the tax office they were sent to a map office. It appears that the tax department of Jersey City very properly keeps plots—maps of all the property—in what is called a map-room. They there found that the property conveyed to Piercy had been mapped, and they got a little plot, which showed them that the

rears of 59 and 60 were included in this description—it is shown here, and Mr. Piercy had the same thing. They then went and talked with their stepmother about it, and she called on Mr. and Mrs. Piercy and called their attention to it, and Piercy brought his deed over to the Bidwell house, where they were out on the lawn in the rear of the house, and showed it to them. Now, here are four witnesses—Mrs. Bidwell, Miss Bidwell, Miss Boyd and the young man Alfred—all present, and they all swear that Piercy produced the deed and said, "Why, here is what I have got," and showed them this lot 137 on this little plot annexed to the deed. Well, the complainant produced the other slip, which they got from the tax office, and said, "They say down at the tax office that the deed took in a large part of 59 and 60 in the rear;" and they all swore that he (Piercy) said, "That is a mistake down in the tax office, for here is my map, which shows what was conveyed for lot 137." Now, they all unite in swearing to that, and what does Mr. Piercy say? Why, he says that he told them that the mistake was in the map annexed to the deed—Mr. Mumford's map—and the tax office map was right, and the mistake was in Mumford's map. Well, to say nothing of there being four to one in swearing, I am sorry to say that Mr. Piercy's own statement is slightly misleading because he had that deed in his possession all this time; had put it on record and taken it from the records; saw it when it was executed; saw it when he paid his money for it, and he knew what that map showed before the complainants came to him to know what the deed was for. And the effect of the evidence is to show that Mr. Piercy understood, just as Mrs. Bidwell did, that they were conveying lot 137, and no more. That is a question of veracity between them that I do not care to settle at all, except that the clear presumption is that Mr. Piercy understood all about that deed from the beginning to, the end, and understood that little map. ·Now, if the map had been made on the deed itself it would not have been so striking, but it is made on a little piece of paper, about four by three inches, and it is pasted with gum on a place left for it, and it is a thing that you so seldom see that it was impossible for Mr. Piercy not to see, and

I was very sorry to hear him say that he did not know whether it was there when the deed was made or not.

One other thing I will refer to. Mrs. Bidwell did not recollect that Mr. Vere came there to take the acknowledgment. She says Mr. Mumford brought the deed there at night. I have no doubt that is so—brought the deed there at night—and Vere came the next morning, according to his story, about ten or eleven o'clock, and that has escaped her mind. I do not believe Mrs. Bidwell intended to prevaricate; I certainly do not believe those four witnesess invented the story they told about Mr. Piercy.

Now, let us come to the strength of the evidence as to Bidwell's mental capacity at that time. Now, as I have remarked in the course of the production of the evidence yesterday, it depends on the character of the business a man is about to undertake requiring mental exercise as to whether he is equal to it or not. A child can do some things better than a man, and a man can do things that a child cannot. So a man, senile with old age, weak, unable to transact important business or do a day's work, as the saying is, can attend to the ordinary affairs of life. He knows his errands, he knows what he needs, he can go to market, he can collect his interest and his rents. That is one grade of mental capacity. But of all the things and transactions that ordinary business men have to do—especially dealing in real estate, fixing a price on it—a thing that has no stated price—fixing the value of it and what to take for it—there is where the highest mental capacity is required. Now, we have here a man dealing with a piece of real estate that required the highest degree of mental capacity. I do not mean as high a degree of mental capacity as though he had had a great deal larger piece to deal with, or if it was a more complicated transaction. I do not mean that, but of the grade, the kind, of business that requires the highest mental capacity, because here a mistake of $50 or $100 on $200 is as great, proportionately, as it would have been if the matter was $200,000.

Now, the doctors say that Mr. Bidwell suffered a very severe stroke of apoplexy; that it produced unconsciousness for a

length of time, and when he was partially recovered that the man never did regain his mental faculties in full, and that he never was capable of reasoning and judging of any serious matter; he never was able to keep a thought or an idea in his mind long enough to compare it with another idea—that is, judgment. His mind would wander from one thing to another. He would talk along with you and enjoy himself and all that, but when it came to any mental exercise as distinguished from mere mental abandon—taking things as they came along—he was not able to do it—he was not able to endure any mental labor or exercise. That is their idea of the situation. I cross-examined them very carefully. I did not put it to the witnesses just as I did to Dr. McGill and to Dr. Evans in the *Collins Case,* but I cross-examined them as to his ability to exercise his mind and handle things in his mind—keep ideas there and think about them—and they were unanimous that he had not the ability to do so, and would fall into hysterics and cry. The moment you talked with him about business, or anything that required thought, he broke right down. That was the effect of their evidence. Now, a man in that condition is simply unfit to do important business, particularly with regard to buying and selling real estate. And this is easily believed when we understand that he had suffered a severe stroke of apoplexy, and was also suffering from softening of the brain.

My conclusion from the evidence is that his mental capacity did not come up to the standard of Chief-Justice Kirkpatrick, which I applied in *Kastell* v. *Hillman, 53 N. J. Eq. (8 Dick.) 49,* and again in *Thorp* v. *Smith, 63 N. J. Eq. (18 Dick.) 70* (at *p. 92*), and again in *Collins* v. *Toppin, 65 N. J. Eq. (20 Dick.) 439.* These last two cases were affirmed on appeal (*65 N. J. Eq.*), and the chief-justice, in *Thorp* v. *Smith,* adopts the last part of my opinion, including the quotation from Chief-Justice Kirkpatrick, wherein he states the true standard of testamentary capacity to be the ability "clearly to discern and discreetly to judge of all those things and all those circumstances which enter into the nature of a rational, fair and just disposition of his property." It is a familiar rule that a less degree of

mental capacity is sufficient to sustain a testamentary disposition where the testator is not subjected to undue influence than is necessary to sustain an important business transaction involving the purchase and sale of landed property.

Now, what does Mr. Piercy swear? He swears that Mr. Bidwell wanted to sell this lot because he was hard up for money: that Bidwell told him he had been trying to sell some property. Now, Mrs. Bidwell says they were not hard up; they were not in straitened circumstances, and had no occasion to sell anything. I suppose he had sold out his business and got something from that. She denies that they were in want; that the sole object, as she understood it, was to relieve his mind from this idea that he was going to be taxed for the greenhouses; having these tax bills come in and having to run to Mr. Piercy and say, "Here, you must pay this bill." That was the only reason he wanted to sell.

He was hard up for money? Well, how much did he get? Two hundred dollars. That did not relieve him to any extent, but Mr. Piercy says he wanted to sell it to Mrs. Piercy because he felt under obligations to Mr. Piercy, and Mr. Piercy had been such a good friend, and all that sort of thing. Such a moving consideration is of itself, as it seems to me, evidence that he was influenced by improper motives.

Upon the whole, I am not satisfied that the man was in a competent state of mind to transact that particular piece of business, being, as he was, under the influence of Mr. Piercy day in and day out in his greenhouse, and treating him as a confidential friend. Therefore, I am of the opinion, in the absence of estoppel, that the whole transaction should be set aside.

As to estoppel, there is not the least evidence before me that any change in any respect has been made by Mrs. Piercy in her business or arrangements in consequence of this deed to set up an estoppel. She has not changed a building; she has not increased the value of any building; she has not spent a dollar on the property that she would not have spent under the old lease; they have not taken possession or encroached on the rear of 59 and 60 one particle. They say they took possession; they say

they have always been in possession. They were in possession of ten feet of the rear of the Jackson avenue lots, and that possession remains, but they had never showed their hand to prove that they had the title to the rear of the lots, and I think it will harm no one by just reconveying this property upon the payment of the $200.

I think there is no occasion for anything to be said about rent or interest. It is not worth taking account of. Mrs. Piercy won't lose anything and the parties won't lose anything. They have lost the rent in the meantime, except the rent for the ten feet, but it is not necessary to take any account of that here.

You are entitled to a counsel fee if you ask for it.